IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KENNETH A. MANNS,<br><br>             Plaintiff,<br><br>    v.<br><br>T. SIMS; T. HOEY; RAVI SOOD;<br>D. ALATARY; DR. AHMAR SHAKIR;<br>JEFF THOMAS; DR. NEWLAND; MR.<br>CHUDZINSKI; MS. DYNAN; MR. E.<br>WATSON; S. DONEPUDUDI; OFFICER<br>GRANT; VINCENT ELIAS; L.<br>DIMATTEO; PRADIP PATEL; S.<br>MARUSKA; TRANSPORT OFFICER 1;<br>ALLEN SKRENTA; SHERIFF SAAD;<br>MATHEW DENG; HARRY J. LAWAL,<br><br>             Defendants. | HONORABLE JEROME B. SIMANDLE<br><br><br>Civil Action<br>No. 17-3815 (JBS-AMD)<br><br>**OPINION** |

APPEARANCES:

Kenneth A. Manns, Plaintiff Pro Se
3900 Emmart Ave.
Baltimore, MD 21215

**SIMANDLE, District Judge:**

## I.    INTRODUCTION

Before the Court is Plaintiff Kenneth Manns' ("Plaintiff") submission of a civil rights complaint pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Docket Entry 1. At this time, the Court must review the complaint to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which

relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief. For the reasons set forth below, the Court concludes that the complaint will proceed in part.

## II. BACKGROUND

Plaintiff brings this civil rights action against several officials at FCI Fort Dix, New Jersey, where he was previously incarcerated. The following factual allegations are taken from Plaintiff's declaration in support of his complaint, Exhibit D, and are accepted for purposes of this screening only. The Court has made no findings as to the truth of Plaintiff's allegations.

Plaintiff states that he tore his right Achilles tendon on September 14, 2014. Exhibit D ¶ 1. A physician's assistant gave him Motrin, a bandage, and crutches and told Plaintiff that his leg was fine aside from a "bad ankle sprain." *Id.* Plaintiff requested bottom-bunk and first-floor passes, but the assistant denied the request stating that Plaintiff did not meet the requirements for those passes. *Id.* The next day, Plaintiff went to sick call to see a doctor about his injury. *Id.* ¶ 2. He informed the physician's assistant that he tore his Achilles tendon and did not have an ankle injury. *Id.* The physician's assistant said Plaintiff was going to be put in for x-rays because his chart said he had an ankle injury. *Id.* Plaintiff told both the physician's assistant and the x-ray technician

that he did not have an ankle injury, but both people told Plaintiff that his chart indicated there was an ankle injury so they were going to perform x-rays on the ankle. *Id.* Plaintiff was told he would see an orthopedic doctor the next day. *Id.*

On September 16, 2014, Plaintiff spoke with another physician's assistant about his injury. *Id.* She told him that his x-rays had not yet been read by the doctor and that Plaintiff should come back later that afternoon. *Id.* Plaintiff returned at 3:00pm as requested but was told the doctor had left for the day. *Id.* Plaintiff returned the following day and asked when he would be able to see the doctor. RN Jeff Thomas said if "the Dr. didn't call you yet it's because your injury must not be that serious." *Id.* Plaintiff stated he had previously ruptured his left Achilles tendon, making him familiar with the symptoms, and again asked to see the doctor. *Id.* Thomas replied the doctor would not be back until the next month as he only came to the prison once a month. *Id.* Plaintiff spoke with Assistant Warden Dynan and told her that he was not receiving medical attention for his injury. *Id.* She told Plaintiff "she would get on top of the situation and [he] should check the call out list everyday for an appointment with the Dr." *Id.*

Plaintiff brought his concerns to the attention of Administrator Director of Health & Medical, Mr. Chudzinski, on September 22, 2014. *Id.* ¶ 3. Plaintiff requested to see a doctor

immediately and to be given bottom-bunk and first-floor passes. *Id.* Mr. Chudzinski then paged Dr. Newland and spoke with him over the phone. *Id.* Dr. Newland came to Mr. Chudzinski's office and examined Plaintiff's leg. *Id.* He told Plaintiff that it was a very bad ankle sprain, not an Achilles tendon injury. *Id.* Plaintiff responded that he knew what an Achilles tendon injury felt like because he had had one before, and Dr. Newland "responded in a sarcastic tone and manner, what if you're lying to us to get some type of special medical treatment you could be telling us anything." *Id.* Plaintiff responded that Dr. Newland was not qualified to diagnose his injury as he was not an orthopedist. *Id.* He requested an MRI and told Dr. Newland and Mr. Chudzinski that he wanted bottom-bunk and first-floor passes. *Id.* Plaintiff was given a walking boot and a 30-day bottom bunk pass. *Id.* Dr. Newland said he would put in the computer that Plaintiff was to be on the first floor. *Id.*

Plaintiff was finally examined by the orthopedist, Dr. Shakir, on October 21, 2014. *Id.* ¶ 4. Dr. Shakir confirmed that Plaintiff had ruptured his right Achilles tendon and that Plaintiff needed to have surgery right away. *Id.* When Plaintiff asked when the surgery would take place, Dr. Shakir responded "it could take up to 6 months . . . you're not the only person who needs surgery in Fort Dix." *Id.* (ellipses in original).

4

Plaintiff met with Mr. Chudzinski and Dr. Newland again on October 28, 2014. *Id.* He inquired as to when his surgery would take place, and Dr. Newland said it would be alright if Plaintiff had to wait for 6 months. *Id.* Plaintiff objected to waiting for that length of time, and Dr. Newland said it would take place whenever the Utilization Review Committee approved the procedure. *Id.* Plaintiff continued to request placement on the first floor from several officials. *Id.*

Plaintiff's surgery took place on November 14, 2014. *Id.* ¶ 5. He was instructed to follow up with the orthopedic surgeon in two weeks. *Id.* Upon returning to Fort Dix, Plaintiff was taken back to the third floor even though his discharge instructions required him to be on the first floor and bottom bunk and prohibited him from using the stairs for four months. *Id.* Plaintiff did not receive the Codeine or Percocet that he was prescribed after surgery. *Id.* ¶ 6. He could not go to the medication line, which was on the first floor, because he could not make it down the stairs. *Id.*

As of January 15, 2015, Plaintiff still had not had his two-week follow-up with Dr. Shakir to remove his cast and sutures. *Id.* ¶ 7. Plaintiff asked CO Grant why he had not been able to see Dr. Shakir, but CO Grant only told him to come back the next morning at sick call. *Id.* Plaintiff was called down to medical in the afternoon of January 15 to have his cast and

sutures removed. *Id.* When Plaintiff arrived at medical, Dr.
Shakir was not there. A physician's assistant said the cast and
sutures were going to be removed and a new cast would be put on.
*Id.* The physician's assistant removed the cast and sutures and
told Plaintiff that it looked like his leg was healing well. *Id.*
He told Plaintiff to wash the leg and return the next day. *Id.*
He gave Plaintiff a bandage and told Plaintiff to put his
walking boot back on. *Id.*

Plaintiff went back to medical the next day as instructed.
*Id.* When he arrived, the person on duty asked him why he was
there. *Id.* He told her that the other physician's assistant had
instructed him to return; the on-duty assistant made a phone
call describing Plaintiff's leg to someone, and then told
Plaintiff to keep his boot on for 8 weeks and to flex his foot
every day. *Id.*

Plaintiff saw Dr. Shakir again about a month later on
February 10, 2015. *Id.* ¶ 8. Dr. Shakir asked why Plaintiff was
wearing a walking boot, and Plaintiff responded that he had been
told by the physician's assistant to wear it. *Id.* Dr. Shakir
responded that Plaintiff was supposed to be walking on his own.
*Id.* Plaintiff said that he could not walk on his own due to the
pain, and Dr. Shakir told Plaintiff to use the boot for another
three weeks. *Id.* Plaintiff requested a soft-shoe pass, and Dr.
Shakir said he did not issue those passes so Plaintiff would

have to speak to someone else. *Id.* Plaintiff also asked about physical therapy, but Dr. Shakir said Plaintiff was not entitled to physical therapy "because you are a prisoner in a federal prison." *Id.*

Plaintiff went to renew his bottom bunk and first floor pass on February 20, 2015, but he was told that they could not be renewed because there was no record of him having those passes. *Id.* ¶ 9. When Plaintiff objected, Dr. Newland said he would only renew the passes for three months. *Id.* Plaintiff removed his cam boot on March 1, 2015. *Id.* Since then his leg has been in extreme pain. *Id.*

Plaintiff was expelled from the Residential Drug Abuse Program ("RDAP") on February 26, 2015 and was moved from the first floor to the third floor. *Id.* ¶ 10. He spoke with counselor T. Simms about his passes for the first floor and bottom bunk, and Simms said "I don't care what you have it's other guys in here that's in worse shape than you so I don't care what pass you have." *Id.* Simms then said there was nothing in the computer system about Plaintiff having a first floor pass. *Id.*

Plaintiff saw a different doctor, Dr. Patel, on April 13, 2015. *Id.* ¶ 11. He complained about being on the third floor and requested soft shoes because of the pressure on his Achilles tendon from the tennis shoes. *Id.* Dr. Patel said that only

diabetics or people with deformed feet could have soft shoes. *Id.* Dr. Patel authorized the soft shoe after Plaintiff showed Dr. Patel his swollen foot. *Id.* Dr. Patel said Dr. Newland should have put Plaintiff in soft shoes back in September 2014. *Id.* Plaintiff requested a transfer to a medical center, but Dr. Patel said Plaintiff did not meet the criteria. *Id.* Plaintiff said that he had checked the eligibility criteria and believed he qualified, but Dr. Patel said "the bosses would be mad at me because I moved you and I won't be put in for a promotion because the government would be mad." *Id.* Dr. Patel gave Plaintiff a physical therapy printout for Achilles tendonitis and renewed Plaintiff's prescription for Ibuprofen. *Id.*

On April 16, 2015, Plaintiff spoke with Mr. Chudzinski about not yet receiving his soft shoes. *Id.* ¶ 12. Mr. Chudzinski sent Plaintiff down to medical where he received a pair of size 10 shoes. *Id.* While Plaintiff was being fitted for his shoes, he asked Mr. Chudzinski how he could be transferred to the medical facility. *Id.* Mr. Chudzinski told Plaintiff to talk to Dr. Patel. *Id.*

Plaintiff saw Dr. Shakir on May 5, 2015. *Id.* ¶ 13. He told Dr. Shakir that his foot and Achilles tendon were in constant pain and were always swollen. *Id.* He also stated that the soft shoes hurt his feet. *Id.* Dr. Shakir told Plaintiff that he needed hi-top boots. *Id.* A week later, Plaintiff saw Nurse

Maruska and was told to pick up his pain medication that afternoon. *Id.* ¶ 14. When he arrived at pill call, he was told that his prescription had been rejected. *Id.* Plaintiff saw a doctor on July 28, 2015 and informed him he was having head and neck pain, and the doctor said he would schedule an x-ray. *Id.* Plaintiff said he needed an MRI. *Id.* Plaintiff had x-rays taken of his neck, back, Achilles tendon, and head on August 10, 2015. *Id.* ¶ 15.

Plaintiff picked up his orthotic boots from Dr. Lawal on October 16, 2015. *Id.* ¶ 16. Plaintiff told the doctor that the boots were not helping with his pain. *Id.* Plaintiff spoke with Mr. Wilkes in the medical department on October 23, telling him that the boots were too big. *Id.* ¶ 17. Mr. Wilkes said he would schedule Plaintiff another visit with Dr. Lawal for a refitting. *Id.*

Plaintiff had a follow-up appointment with Dr. Shakir on October 27, 2015. *Id.* ¶ 18. Plaintiff told him about his the pain in his foot and Achilles tendon due to the boots. *Id*. Dr. Shakir said Plaintiff had plantar fasciitis and tendonitis. *Id*. Plaintiff asked if it was because he was not doing physical therapy, and Dr. Shakir said Plaintiff was not entitled to physical therapy because it was not a serious injury. He told Plaintiff to stretch and exercise and to not wear the ill-fitting boots and to get arch support insoles. *Id.*

Plaintiff went for his appointment to Dr. Lawal to get his boots adjusted, but he was not wearing his boots. *Id.* ¶ 19. Plaintiff told Dr. Lawal about the problems he was having with the boots, and Dr. Lawal measured Plaintiff's feet. The transportation officers put leg irons on Plaintiff even though his medical file indicated flex cuffs should be used. *Id.*

Plaintiff went to sick call on November 30, 2015 to get his medication renewed and to speak with the doctor about the issue with the transportation officers. *Id.* ¶ 20. The physician's assistant said he would not renew Plaintiff's Ibuprofen because Plaintiff was not a chronic care patient, but Plaintiff could buy medication over the counter. *Id.* He gave Plaintiff 24 Ibuprofen tablets. *Id.* Plaintiff renewed his prescription via computer on January 4, 2016, but when he picked up his medicine the next day there were only two tablets in the bottle. *Id.* ¶¶ 21-22. Plaintiff received a letter from the Utilization Review Committee indicating he would continue to receive "conservative treatment" with "periodic evaluations." *Id.* ¶ 23.

On January 27, 2016, Plaintiff was placed in the SHU in a top bunk. *Id.* ¶ 24. Plaintiff complained to the officers about being in the top bunk, saying he had a bottom bunk pass, and the officer told him he could put his mattress on the floor if he did not like the top bunk. *Id.* Plaintiff asked his counselor,

Mr. Watson, for a grievance form but did not receive one. *Id.* He remained on the top bunk for 48 days. *Id.*

Plaintiff spoke with Mr. Chudzinski about the problem with his boots. *Id.* ¶ 25. Two weeks later Plaintiff spoke with a female physician's assistant about visiting Dr. Lawal. *Id.* He was told to wear his boot and insoles. *Id.*

When Plaintiff was released from the SHU on March 15, 2016, he was put on the second floor in spite of having a first floor pass. *Id.* ¶ 27. He spoke to Mr. Simms about it, but Mr. Simms refused to put Plaintiff on the first floor. *Id.*

Plaintiff's new boots still were not ready on March 25, 2016 when he went to see Nurse Maruska. *Id.* ¶ 28. Plaintiff asked Dr. Patel to renew his first floor pass, prescription, and give him arch supports on April 1, 2016. *Id.* ¶ 29. Dr. Patel said Plaintiff did not need to be on the first floor anymore and that Plaintiff would have to purchase his own arch supports because the medical department did not order those. *Id.* Plaintiff said he was still in pain when he used the stairs and that his medication had been cut from 30 tablets to 10. *Id.* Dr. Patel said this was because inmates were storing medications in their lockers. *Id.* Dr. Patel did not renew Plaintiff's first floor pass. *Id.* The next two times Plaintiff went to pick up his medication he either did not receive it or it was less than the prescribed amount. *Id.* ¶¶ 30, 32.

## III. STANDARD OF REVIEW

Per the Prison Litigation Reform Act, Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996) ("PLRA"), district courts must review complaints in those civil actions in which a prisoner is proceeding *in forma pauperis*, *see* 28 U.S.C. § 1915(e)(2)(B), seeks redress against a governmental employee or entity, *see* 28 U.S.C. § 1915A(b), or brings a claim with respect to prison conditions, *see* 42 U.S.C. § 1997e. The PLRA directs district courts to sua sponte dismiss any claim that is frivolous, is malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. This action is subject to sua sponte screening for dismissal under 28 U.S.C. §§ 1915A and 42 U.S.C. § 1997e because Plaintiff is a prisoner seeking redress from government officials about the conditions of his confinement.[1]

According to the Supreme Court's decision in *Ashcroft v. Iqbal*, "a pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive *sua sponte*

---

[1] Although Plaintiff is no longer confined, the "prisoner" status is determined from the date the complaint is filed.

screening for failure to state a claim,[2] the complaint must allege "sufficient factual matter" to show that the claim is facially plausible. *Fowler v. UPMS Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n.3 (3d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). Moreover, while *pro se* pleadings are liberally construed, they "still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted) (emphasis added).

## IV. ANALYSIS

Plaintiff categorizes his complaint into three headings: pre-surgery medical delay and abuse; immediate post-surgery after care medical denial; and denial of proper medical devices, accommodation, and needed after care physical therapy. Within those headings are several subparts falling into five general categories: deliberate indifference to his medical needs,

---

[2] "[T]he legal standard for dismissing a complaint for failure to state a claim pursuant to § 1915A is identical to the legal standard employed in ruling on 12(b)(6) motions." *Courteau v. United States*, 287 F. App'x 159, 162 (3d Cir. 2008) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)).

medical malpractice, violations of the Americans with Disability Act, Privacy Act violations for false medical records, and failure to supervise claims.[3]

## A. Deliberate Indifference

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. *Id.* at 106.

A medical need is serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Correctional Institution Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted). The Court presumes for screening purposes only that Plaintiff has alleged a serious medical need.

---

[3] The claims are dismissed with prejudice to the extent Plaintiff is seeking damages from defendants in their official capacities as they are entitled to sovereign immunity. *See Hairston v. Miller*, 646 F. App'x 184, 187 (3d Cir. 2016) (citing *Treasurer of N.J. v. U.S. Dep't of the Treasury*, 684 382, 295 (3d Cir. 2012)).

The second element of the *Estelle* test requires an inmate show that prison officials acted with deliberate indifference to his serious medical need. "The hallmark of an Eighth Amendment violation arises when such medical treatment, or the withholding of medical treatment, is accompanied by knowing indifference to the pain or risk of serious injury this will cause, such as by 'persistent conduct in the face of resultant pain and risk of permanent injury.'" *Andrews v. Camden Cnty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000) (quoting *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990)). Deliberate indifference may be found where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) intentionally delays necessary medical treatment based on a non-medical reason; or (3) deliberately prevents a prisoner from receiving needed medical treatment. *See Pierce v. Pitkins*, 520 F. App'x 64, 66 (3d Cir. 2013) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

"[P]rison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). "[T]here is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (quoting *United States ex. rel. Walker*

*v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). "[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Id.*

Plaintiff has not sufficiently alleged an Eighth Amendment claim for the period of time prior to being diagnosed with a torn Achilles tendon. A plaintiff cannot succeed on a medical-needs claim where he merely disagrees with the medical treatment provided or where his allegedly inadequate treatment was "a result of an error in medical judgment." *Parkell v. Danburg*, 833 F.3d 313, 337 (3d Cir. 2016) (discussing *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004)). There is nothing in the complaint or exhibits that would plausibly support Plaintiff's conjecture that he was purposefully misdiagnosed and that defendants conspired to conceal the true nature of his injury. "As the Supreme Court has held, 'a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'" *Pearson*, 850 F.3d at 538 (quoting *Estelle*, 429 U.S. at 106).

The Court will permit the deliberate indifference claim to proceed for delay in care once Plaintiff's had been diagnosed with an Achilles tendon tear on October 21, 2014. Based on the

allegations in the complaint and declaration, this applies to defendants Shakir, Sood, Watson, Chudzinksi, Newland, and Hoey.

Plaintiff has also stated an Eighth Amendment claim based on his immediate post-surgery care against Shakir, Elias, Gibb, Watson, Donepududi, DiMatteo, Newland, and Dee.[4] Specifically, Plaintiff alleges defendants denied him his prescribed pain medication, refused to honor his first-floor and bottom-bunk passes, and ignored his complaints of constant pain. He has not sufficiently alleged a claim against Officer Grant. Plaintiff alleged he asked Officer Grant why he had not been able to see Dr. Shakir on a certain date, but was told to come back the next morning at sick call. Declaration ¶ 7. This is not enough to state a deliberate indifference claim.

Plaintiff's final deliberate indifference claim is based on the failure to provide physical therapy, proper medical devices, and accommodations. Plaintiff has stated a claim based on the failure to provide physical therapy only against Dr. Shakir as he alleges that Dr. Shakir refused to provide physical therapy for a non-medical reason, *i.e.*, Plaintiff's status as a federal prisoner.

Construing the complaint liberally and giving the Plaintiff the benefit of all reasonable inferences, he has otherwise

---

[4] Mrs. Dee and James Gibb do not appear in the caption. The Court will instruct the Clerk to add them.

sufficiently alleged an Eighth Amendment claim in his third claim as it relates to his care for his Achilles tendon injury. Plaintiff also makes vague allegations about failure to care for an existing brain injury, but these allegations are not supported by any facts in Plaintiff's declaration or exhibits.

## B. Medical Malpractice and Negligence

The complaint also seeks to bring medical malpractice and negligence claims against defendants. These claims may only be brought against the United States under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. §§ 1346(b), 2671–2680. *See* 28 U.S.C. § 2679(b)(1); *Osborn v. Haley*, 549 U.S. 225, 229 (2007) ("The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties."); *Lomando v. United States*, 667 F.3d 363, 378 (3d Cir. 2011) (citing H.R. Rep. No. 100–700, at 6, 1988 U.S.C.C.A.N. 5945 at 5950). The Court therefore construes the medical malpractice and negligence claims as being brought against the United States.[5]

---

[5] Plaintiff provided the Court with a copy of a notice of claim filed on November 3, 2016 and denied by the United States on April 19, 2017. *See* Complaint Exhibits 33 & 34.

The Court shall instruct the Clerk to add the United States as a defendant. Plaintiff's FTCA claims shall proceed against the United States.

## C. Privacy Act.

Plaintiff also raises claims under the Privacy Act, 5 U.S.C. § 552a, for inaccurate and/or falsified medical records. "Such claims are exclusively 'within the remedial scheme of the Privacy Act [5 U.S.C. § 552a],' which authorizes a cause of action to be brought against federal agencies only." *Lynn v. Lappin*, 593 F. Supp. 2d 104, 106 (D.D.C. 2009) (alteration in original) (quoting *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)). *See also Kates v. King*, 487 F. App'x 704, 706 (3d Cir. 2012) ("The Act does not authorize suit against individual employees of an agency.'). Even if the Court were to construe the claims as being brought against the Bureau of Prisons ("BOP"), the claims would still have to be dismissed.

"The Privacy Act 'governs the government's collection and dissemination of information and maintenance of its records [and] generally allows individuals to gain access to government records on them and to request correction of inaccurate records.'" *Id.* (quoting *Perry v. Bureau of Prisons*, 371 F.3d 1304, 1304–05 (11th Cir. 2004)) (alteration in original). An individual may bring a lawsuit under the Privacy Act "when an agency intentionally or willfully fails to comply with the

requirements in such a way as to have an adverse effect on an individual." *Lynn*, 593 F. Supp. 2d at 106-07 (citing 5 U.S.C. § 552a (g)(1)(C)(D), (g)(4)). However, the BOP's central record system, including the Inmate Physical and Mental Health Record System, is entirely exempt from the access and amendment requirements and the civil remedies provision of the Privacy Act. 28 C.F.R. § 16.97(a)(5); *see also Brown v. Bureau of Prisons*, 498 F. Supp. 2d 298, 302 (D.D.C. 2007) ("Plaintiff effectively is barred from obtaining any remedy, including damages, for BOP's alleged failure to maintain records pertaining to him with the requisite level of accuracy."). The Privacy Act claims are therefore dismissed with prejudice.

**D. Americans with Disabilities Act**

Plaintiff also raises claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a violation of Title II, Plaintiff must allege: "(1) that he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was

subjected to discrimination by any such entity; (4) by reason of his disability." *Dahl v. Johnston*, 598 F. App'x 818, 819-20 (3d Cir. 2015) (citing 42 U.S.C. § 12132); *see also Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524, 553 n.32 (3d Cir. 2007).

The ADA does not create private causes of action against individuals, *see Boggi v. Med. Review and Accrediting Council*, 415 F. App'x 411, 415 (3d Cir. 2011) (individual defendants cannot be sued in their individual capacities under the ADA); *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002) (holding there was no individual liability under Titles I, II, or III of the ADA); *Garcia v. S.U.N.Y. Health Sciences Ctr.*, 280 F.3d 98, 107 (2d Cir. 2001) (holding Title II does not allow suits against individuals). To the extent the suit could be interpreted as being against the BOP the claims must be dismissed because "[f]ederal detention centers are not protected by the ADA. The ADA does not contain a waiver of sovereign immunity and thus, does not apply to the federal government." *Whooten v. Bussanich*, No. 4:CV-04-223, 2005 WL 2130016, at *7 (M.D. Pa. Sept. 2, 2005) (citing *Hurtado v. Reno*, 34 F. Supp. 2d 1261, 1264 (D. Col. 1999); *Crowder v. True*, 845 F. Supp. 1250 (N.D. Ill. 1994)). *See also Smith v. Pallman*, 420 F. App'x 208, 214 (3d Cir. 2011) (citing 42 U.S.C. § 12132; 42 U.S.C. § 12111(5)(B)).

Plaintiff's ADA claims are dismissed in their entirety.

**E. Failure to Supervise**

Plaintiff alleges Assistant Warden Dynan failed to supervise her subordinates. He has failed to sufficiently allege this claim, and the Court will dismiss it without prejudice.

Failure-to-supervise claims "are generally considered a subcategory of policy or practice liability." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds sub nom. Taylor v. Barkes*, 135 S. Ct. 2042 (2015). To state a failure-to-supervise claim, Plaintiff must identify a supervisory policy or practice that Dynan failed to employ, and provide sufficient facts that, if true, would show: "(1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure." *Id.* at 317 (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). "Normally, an unreasonable risk in a supervisory liability case will be shown by evidence that such harm has in fact occurred on numerous occasions. Similarly, deliberate indifference to a known risk will ordinarily be demonstrated by evidence that the supervisory official failed to respond

appropriately in the face of an awareness of a pattern of such injuries." *Sample*, 885 F.2d at 1118. "[T]he level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged." *Barkes,* 766 F.3d at 319. Here, the level of intent is deliberate indifference.

The only facts alleged against the assistant warden are that Plaintiff spoke with her on September 17, 2014 and told her he was not receiving care for his ankle. Declaration ¶ 2. Five days later Plaintiff met with Mr. Chudzinksi and Dr. Newland, who examined Plaintiff's ankle. *Id.* ¶ 3. There are no grounds supporting a claim against Assistant Wardan Dynan for failure to supervise, which claim will be dismissed.

## V. CONCLUSION

For the reasons stated above, all claims against Assistant Warden Dynan, Jeff Thomas, Matthew Deng, D. Alatary, Sheriff Saad, and Officer Grant are dismissed without prejudice for failure to state a claim. All Privacy Act and Americans with Disabilities Act claims are dismissed with prejudice for failure to state a claim. The First Claim of Eighth Amendment denial of medical care may proceed against defendants Shakir, Sood, Watson, Chudzinksi, Newland, and Hoey. The Second Claim of Eighth Amendment denial of medical care may proceed against defendants Shakir, Elias, Gibb, Watson, Donepududi, DiMatteo, Newland, and Dee. Plaintiff's Third Claim may proceed only on

the claims relating to the care for Plaintiff's Achilles tendon injury. The Federal Tort Claims Act claims against the United States shall proceed.

An appropriate order follows.

**May 16, 2018**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
U.S. District Judge